# [J-35-2024]
## IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| FIREARMS OWNERS AGAINST CRIME - INSTITUTE FOR LEGAL, LEGISLATIVE AND EDUCATIONAL ACTION, LANDMARK FIREARMS LLC, AND JAMES STOKER, | : | No. 32 MAP 2023 |
| | : | |
| | : | Appeal from the Order of the Commonwealth Court at No. 218 MD 2022 dated March 6, 2023 |
| Appellants | : | |
| | : | ARGUED: May 14, 2024 |
| v. | : | |
| | : | |
| COLONEL CHRISTOPHER PARIS, COMMISSIONER PENNSYLVANIA STATE POLICE, | : | |
| | : | |
| Appellee | : | |

## OPINION

**JUSTICE MUNDY**                                                    **DECIDED: May 30, 2025**

In this direct appeal we consider the obligations of the Pennsylvania State Police under the Pennsylvania Uniform Firearms Act to perform "instantaneous" background checks of individuals seeking to purchase firearms, as well as the kind of relief, if any, available to persons aggrieved when that agency's response time is alleged to be too slow to comply with statutory requirements.

## I. Background

The Brady Handgun Violence Prevention Act of 1993 amended the federal Gun Control Act of 1968 to provide a method for preventing firearms transfers to prohibited

persons.[1]  Under the Brady Act, every firearm dealer, known as a federal firearms licensee (FFL),[2] must request a background check on any potential purchaser or firearm transferee.  To aid in fulfilling that mandate, the Brady Act required creation of the National Instant Criminal Background Check System (NICS), a computerized system that stores records on persons who may be disqualified from receiving firearms.[3]  Each state determines its form of interaction with NICS, and each state may use its own background check system, thus becoming a full point-of-contact (POC) state, by designating a local or state law enforcement authority to serve as intermediary between its FFLs and NICS.[4]

Pennsylvania decided to become a full POC state through Act 17 of 1995, which amended Pennsylvania's Uniform Firearms Act.[5]  Act 17, which implements (and supplements) the Brady Act, requires the Pennsylvania State Police (PSP) to establish

---

[1] This background information is partially derived from a December 2020 report by the Legislative Budget and Finance Committee, a joint committee of the Pennsylvania General Assembly, entitled *The Adequacy of Fees Charged for Pennsylvania's Instant Check System*.  Every five years that committee reviews whether there is a need to revise the amount of the instant check fee.  The 2020 report is available online and can be found at  https://lbfc.legis.state.pa.us/Resources/Documents/Reports/690.pdf  (accessed Jan. __, 2025).

[2] An FFL is a person licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to deal in firearms.  Anyone who wants to engage in such a business must obtain a federal license.  *See 10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 714-15 & n.2 (5th Cir. 2013) (citing 18 U.S.C. § 923(a)).

[3] NICS is run by the FBI, which does not charge a fee for a records search.

[4] This is as opposed to non-POC states where FFLs contact the FBI directly to obtain a NICS background check.  There are also several partial-POC states in which background checks for some firearm transactions are obtained through a state agency.

[5] Act of Dec. 6, 1972, P.L. 1482, No. 334, *amended* June 13, 1995, P.L. 1024, No. 17 (Spec. Sess. No. 1).  The Uniform Firearms Act is reposited in the Crimes Code at 18 Pa.C.S. §§ 6101-6128.  It is not a "uniform act" in the traditional sense, and hence, it does not implicate the Statutory Construction Act's mandate that uniform laws be construed consistently with those of other states.  *See* 1 Pa.C.S. § 1972.  Instead, the word "Uniform" in its title refers to the law being uniform throughout this Commonwealth.  *See Allegheny Cnty. Sportsmen's League v. Rendell*, 860 A.2d 10, 21 n.6 (Pa. 2004).

and operate an instantaneous firearm background check program, known as the Pennsylvania Instant Check System, or PICS. PICS became operational in 1998. It interacts with NICS to undertake a comprehensive background screening for potential firearm buyers. The screening process considers federal disqualifications and it also searches state-level data such as juvenile records, mental-health records, and protection-from-abuse orders. *See* 18 Pa.C.S. § 6111.1(b); *PSP v. Madden*, 284 A.3d 272, 275 n.3 (Pa. Cmwlth. 2022); *In re Expungements*, 938 A.2d 1075, 1080-81 (Pa. Super. 2007).[6] PICS is intended to quickly review background information on a prospective firearm purchaser and transmit to the FFL either a unique approval number or a denial. A denied individual may challenge the denial if they believe they have been denied in error.[7]

PSP is required by Act 17 to establish a phone number available daily, including weekends and holidays, from 8:00 a.m. to 10:00 p.m. to respond to background check requests from FFLs. *See* 18 Pa.C.S. § 6111.1(c). It is also required to employ and train sufficient personnel to "expeditiously" comply with all requirements listed in Section 6111.1. *Id*. PSP carries out all of these functions through its Firearms Division, which is further subdivided into, *inter alia*, the PICS Operations Section and the PICS Challenge Section. To fund such operations Act 17 established the Firearm Records Check Fund, *see* 18 Pa.C.S. § 6111.3,[8] which is fed by two separate fees pertaining to firearm sales

---

[6] *See also* FBI Criminal Justice Information Services Division, *National Instant Criminal Background Check System (NICS) Operations*, at 1 (2014) (listing several federal databases that are searched for records during a NICS background check).

[7] PICS is also used by sheriffs when a person seeks to obtain or renew a Pennsylvania license to carry (LTC) permit. *See* 18 Pa.C.S. § 6109; Unsworn Affidavit of Lieutenant Shandra P. Keeler ("Keeler Affidavit") at ¶ 5, *reprinted in* RR. 380a. However, our discussion will be confined to firearm purchases as the present challenge is only directed to background checks for such purchases. It does not include any challenge to the process for obtaining or renewing a LTC permit.

[8] The Uniform Firearms Act also refers to this fund as the Firearm Instant Records Check Fund, *see id*. § 6111.2, and the Firearm Ownership Fund, *see id*. § 6102.

and background checks: a $3.00 surcharge on the sale of each firearm, *see id*. § 6111.2(a), and a $2.00 fee charged to FFLs for each request they make to PSP for an instant background check, *see id*. § 6111(b)(1.2), (b)(3).

## II. Procedural history

In May 2022, Firearms Owners Against Crime – Institute for Legal, Legislative and Education Action, Landmark Firearms, LLC, and James Stoker, owner of CYA Holsters, LLC, d/b/a CYA Firearms, Appellants herein (collectively, "FOAC"), filed an amended petition for review in the Commonwealth Court, addressed to its original jurisdiction and naming PSP as the respondent.[9] In the Amended Petition, FOAC averred that, although PSP used to staff the PICS Operations Section[10] with at least a dozen workers at any time so that background checks were completed in an acceptable amount of time, at some point PSP began intentionally understaffing that unit so it only contained a few workers at a time responsible for conducting nearly 1,500,000 background checks per year. According to FOAC, this understaffing has led to delays in completing background checks that typically exceed seven hours (and in some cases 34 hours), which in turn has caused customers to cancel pending transactions and dealers to lose substantial income – all in derogation of the legal rights of the various individuals involved.

In Count I of the Amended Petition, the relevant count herein, FOAC asserted that PSP's new practice of only employing a few workers for the PICS Operations Section violates the Uniform Firearms Act's requirement that each background check be

---

[9] FOAC styled the caption of its Amended Petition to name the Commissioner of the Pennsylvania State Police as the respondent. For ease of discussion, he will be referred to herein as PSP inasmuch as he was named in his official capacity only.

[10] Throughout the Amended Petition FOAC referred to the PICS Operations Section as the "Instant Check Unit." It appears that title is another name for the PICS Operations Section or refers to its call center. As any such distinction is immaterial to this case, we will, for consistency, refer solely to the PICS Operations Section.

"instantaneous" or "immediate" as stated in various facets of Act 17, and as reflected by the name given to PICS by the General Assembly, *i.e.*, the "Instantaneous Criminal History Records Check System," 18 Pa.C.S. § 6111(a)(2), and as further reflected by the statutory mandate that PSP hire and train sufficient personnel to administer PICS "expeditiously," *id*. § 6111.1(c). FOAC alleged PSP's failure to staff its PICS Operations Section adequately amounted to "outright defiance" of these statutory requirements. Amended Petition ¶ 52.[11]

As for relief, FOAC asked the court for a declaration stating PSP's new practice fails to comply with the Uniform Firearms Act. It also requested injunctive relief requiring PSP to comply with the relevant provisions of the Uniform Firearms Act, as amended by Act 17, either by repurposing existing employees or by hiring and training as many new employees as necessary to ensure all background checks are performed "instantaneously" and the responses are "immediate." Separately, FOAC asked the court to enjoin PSP from charging the $2.00 fee for any background check where the customer cancels the gun purchase due to a delayed response.

In the meantime, FOAC had filed an Application for Special Relief in the Form of a Preliminary Injunction Under Pa.R.A.P. 1532. The court held an evidentiary hearing on

---

[11] In Count II, FOAC charged that PSP's new practice, by failing to provide an immediate determination of whether a person is eligible to receive a firearm, violates the rights of the prospective purchaser and seller under Article I, Sections 1 and 21 of the Pennsylvania Constitution. *See* PA. CONST. art. I § 1 (making the right to enjoy and defend life, liberty, and property "inherent and indefeasible"); *id*. § 21 (guaranteeing to the citizens the right to bear arms in self-defense). In its prayer for relief, FOAC referred to the aforementioned sections of Pennsylvania's organic law as well as the Second Amendment. In its appellate brief to this Court, however, FOAC has not included any specific argumentation concerning how these provisions may entitle it to the relief it seeks – at least beyond the generalized contention that, consistent with the separation-of-powers precept, Article I, Section 21 ensures that the General Assembly makes basic policy choices. *See* Brief for Appellants a 29-30. FOAC has therefore waived its constitutional arguments for purposes of this appeal, and this is true notwithstanding that such deficiency is remedied to some degree in its reply brief. *See Commonwealth v. Bracey*, 795 A.2d 935, 940 n.5 (Pa. 2001).

the application, at which Landmark Firearms owner Benjamin Brown testified, as did James Stoker and PSP Lieutenant Shandra Keeler.

Brown and Stoker described the difficulties they have experienced with hours-long wait times for background checks, both in their shops and at gun shows where a large percentage of their sales take place. These witnesses stated that the increasing delays have adversely affected their business, causing lost income and productivity,[12] and noting further that in 2019 and earlier years the wait times were much shorter.[13] They attributed the change to information and belief that PSP had drastically reduced the number of individuals available in the PICS Operations Section to work on requests that build up in a queue when the initial database search on the purchaser reveals the existence of a record that prevents PICS from issuing an automatic approval.

For her part, Lieutenant Keeler testified that she oversees all background-check operations at PSP, and she described how the PICS Operations Section makes background checks available to firearms FFLs. The FFL calls the IVR (interactive voice response) phone system or accesses the E-PICS website to contact PSP and supply their dealer credentials, at which time they then identify the prospective buyer and initiate a background check. PICS obtains additional biographical information about the buyer from PennDOT and confirms with the FFL that that is the correct person. PICS then automatically searches state and federal databases, and if no record is found it transmits

---

[12] The testimony suggested that for privacy reasons some shop owners only schedule one customer at a time, and that before 2020 they could have a customer appointment every 30 minutes. With longer wait times the number of appointments possible in a day has substantially decreased. *See, e.g.*, N.T., 5/12/2022, at 30. This also means some customers have to make multiple long trips to and from the gun store, sometimes on different days, which reduces demand and sales income. *See id*. at 31. Stoker attested these types of delays had cost him more than 250 work hours. *See* Declaration of James Stoker at ¶ 13, *reprinted in* RR. 370a.

[13] *See, e.g.*, *id*. at 28 (testimony of James Stoker that background checks that used to take 10 to 20 minutes are now taking three to four hours).

a unique approval number to the dealer. In that instance, no humans are involved in the process other than the FFL. That type of fully-automated approval only takes a few minutes and it occurs for about 65% of the background-check requests. The wait time for these transactions has not gone up since 2019, and FOAC is not currently challenging PSP's actions with regard to such cases. In the other 35% of the background checks, there is a database record "hit" and the search is put into a queue for operator handling.

When an operator takes a job from the queue, they first check if the buyer is indeed the same person whose record was found in the database search. If not (*e.g.*, the database hit could have been on a different person with the same name or a similar name), the operator approves the sale. If the operator cannot make that determination right away, they obtain more information from the entity with the information such as a local police department or a court system. If it turns out there was a match, even more information may have to be gathered to ascertain whether there are prohibitors within the matched record precluding the individual from owning a firearm. For instance, the record may be missing a final disposition or it may not be clear whether the matter involved domestic violence. *See* 18 Pa.C.S. § 6111(b)(7) (referring to investigative delays). In any such instance where PSP needs to delve further to complete the check, PSP advises the FFL that the request is in "research status."

When considering approvals generated after human intervention, as of 2019 the average wait time was 15 minutes, whereas by 2021 that statistic had gone up to 82 minutes. *See* N.T., 5/12/2022, at 85-86 (reflecting also that denials take even longer). Lieutenant Keeler clarified that these wait times only account for business hours, meaning where a wait period extends into the next day, the interval from 10:00 in the evening to 8:00 the next morning is not counted. Thus, a 35-minute wait for a background check starting at 9:30 p.m. would finish at 8:05 the next morning, and a wait time listed in PSP's

records as nine or ten hours might translate into 19 or 20 hours of elapsed time. She denied there had been any practice or policy changes concerning how background checks are conducted that might account for this 550% increase in the average wait time for approvals requiring human intervention. *See id*. at 87-92, 95.

Lieutenant Keeler explained the PICS Operations Section has operators processing jobs from the queue and supervisors who monitor the queue during high-volume times and notify FFLs about increased wait times via the website. She estimated that at any given time, for every 100 calls in the queue there would be a one-hour wait time, and the longest delay for a single request she could remember was ten hours, which occurred during a gun show in April 2022.[14] To cover the statutorily-required business hours of 8:00 a.m. to 10:00 p.m., seven days a week, PSP works in teams consisting of one supervisor plus six-to-eight operators. In 2019 there were 51 operators total, while in 2022 there were 56 operators. This growth was in response to an increase in volume, which she attributed to the Covid-19 pandemic, from approximately 900,000 to 1,400,000 background-check requests annually. On Mondays through Saturdays four teams work the first shift and two teams work the second shift, while on Sundays two teams work each shift. The number of teams assigned to each shift is based on the expected request volume. The Lieutenant's practice is to review the call-volume data annually to determine whether the number of teams working each shift should be adjusted. *See id*. at 56, 100. Keeler Affidavit at ¶¶ 10-12, reprinted in RR. 380a-381a.

---

[14] At some point, PSP began displaying a banner on its website to notify the public of the expected delay, particularly when it was receiving an unusually high volume of requests. FOAC attached to its pleadings a screen shot showing a 34-hour expected delay, but Lieutenant Keeler stated in her testimony and affidavit that that number was probably a typographical error, because to her recollection the highest number of jobs waiting in the queue during the previous three years had been 900-1,000, which would have yielded wait times of around nine or ten hours (not including the hours when PICS was closed between 10:00 p.m. and 8:00 a.m.). *See* N.T., 5/12/2022, at 65, 91-92, 95; Keeler Affidavit, *supra* note 7, at ¶¶ 27-30, *reprinted in* RR. 384a.

As for why the wait times have lengthened since 2019, Lieutenant Keeler attributed the change to the above-noted increase in volume, high employee turnover (in part due to mandatory overtime instituted during the pandemic), the need for six months of training for an operator to come fully up to speed, and the need for seasoned operators to take time away from their caseloads to train and mentor new operators. She also mentioned that any attempt to reassign experienced operators who had transferred to other jobs within PSP to the PICS Operations Section was slowed down because such moves have to be made in consultation with their union. *See id*. at 61-62. Military deployments and health absences occasioned by the pandemic also contributed. *See* Keeler Affidavit, *supra* note 7, at ¶ 23, *reprinted in* RR. 383a. She opined there is nothing PSP can do to prevent the delays from occurring. *See* N.T., 5/12/2022, at 103.

She stated in spite of the longer wait times since 2019, she is not requiring overtime as that did not improve efficiency when it was tried earlier due to its impact on employee morale and retention. *See id*. at 98. To the extent more workers would help reduce delays, she testified PSP forwarded a budgetary request to the Legislature for additional personnel, including 18 new operators and two new supervisors, but she was unaware of the status of that request. *See id*. at 62, 104-05; Keeler Affidavit at ¶¶ 13-16, *reprinted in* RR. 381a-382a. She explained the PICS Operations Section was down eight employees from its peak, but PSP was not posting job openings online – something it does once or twice a quarter – due to where PSP was in its cycle of posting jobs, screening applicants, and making employment offers. She added five candidates were undergoing background checks. *See* N.T., 5/12/2022, at 98-104. A full complement in the PICS Operations Section would include 64 operators and eight supervisors. *See id*. at 80.

On September 2, 2022, the Commonwealth Court ruled on the Application for Special Relief by single-judge opinion and order. *See FOAC v. Evanchick*, No. 218 M.D.

2022, *slip op*. at 15 (Pa. Cmwlth. Sept. 2, 2022) (McCullough, J.) ("*FOAC I*"). The court listed findings of fact largely tracking the Amended Petition's allegations as well as the witness affidavits and testimony. In terms of staffing the court found that "several operator positions remain vacant to date, and PSP has not put into place a clearly-defined plan to increase staff to abate the extended wait times." *Id*. at 7. The court proceeded to explain that the Uniform Firearms Act, as amended by Act 17, provides in relevant part:

> **(b) Duty of Pennsylvania State Police.**--(1) Upon receipt of a request for a criminal history, juvenile delinquency history and mental health record check of the potential purchaser or transferee, the Pennsylvania State Police shall ***immediately*** during the licensee's call or by return call ***forthwith***:
>
> > (i) review the Pennsylvania State Police criminal history and fingerprint records to determine if the potential purchaser or transferee is prohibited from receipt or possession of a firearm under Federal or State law;
> >
> > (ii) review the juvenile delinquency and mental health records of the Pennsylvania State Police to determine whether the potential purchaser or transferee is prohibited from receipt or possession of a firearm under Federal or State law; and
> >
> > (iii) inform the licensee making the inquiry either: (A) that the potential purchase or transfer is prohibited; or (B) provide the licensee with a unique approval number.
>
> \* \* \* \* \*
>
> **(c) Establish a telephone number.**--The Pennsylvania State Police shall establish a telephone number which shall be operational seven days a week between the hours of 8 a.m. and 10 p.m. local time for purposes of responding to inquiries as described in this section from licensed manufacturers, licensed importers and licensed dealers. ***The Pennsylvania State Police shall employ and train such personnel as are necessary to administer expeditiously the provisions of this section.***

*Id*. at 3-4 (quoting 18 Pa.C.S. § 6111.1(b), (c)) (emphasis added by Commonwealth Court). The court then focused on evidence that for the 35% of background checks that require manual intervention, routine wait times have ballooned since 2019 to nine or ten hours during peak times, *see id*. at 14-15, and it described the effects of this change:

> The testimony further revealed numerous instances where prospective purchasers of firearms canceled their purchases because of excessive wait times, thus causing Petitioners to lose the profits that they would have received from those sales. These delays, especially during gun shows (of which PSP has prior notice) have been going on now for years, and PSP does not appear to have a clear plan in place to abate these wait times.

*Id*. at 15.

The Commonwealth Court ultimately held FOAC had made a preliminary showing that (a) PSP has a statutory duty to employ enough operators to ensure compliance with the above-quoted statutory provisions and to administer the PICS Operations Section "expeditiously," *id*.; and (b) PSP was in violation of Section 6111.1 through its failure to adequately staff its PICS Operations Section to meet increased demand, which in turn has caused firearms sellers to suffer financial harm. Thus, the court preliminarily enjoined PSP from "further noncompliance with section 6111.1," while deferring the award of any additional relief until after disposition of PSP's preliminary objections. *Id*. at 15-16. The court recognized compliance by PSP would be challenging in view of the increase in firearm sales over the past few years combined with external factors affecting staffing (such as the then-extant Covid-19 pandemic), but it "encourage[d] PSP to take necessary action to alleviate the excessive wait times identified above." *Id*. at 16 n.11.[15]

---

[15] On September 7, 2022, five days after the preliminary injunction was issued, PSP filed a notice of appeal, which effectuated an automatic supersedeas of the preliminary injunction order. *See* Pa.R.A.P. 1736(b). After noting probable jurisdiction, we stayed the briefing schedule at the parties' request because the Commonwealth Court's adjudication of PSP's preliminary objections, discussed *infra*, was pending. *See Firearms Owners Against Crime v. Evanchick*, No. 94 MAP 2022, Order (Pa. Oct. 25, 2022).

Additionally, several days after the evidentiary hearing, FOAC filed an Application for Summary and Special Relief in the Nature of a Writ of Mandamus and Declaratory and Permanent Injunctive Relief. PSP thereafter filed preliminary objections asserting sovereign immunity, separation of powers, lack of standing to challenge the $2.00 fee, and demurrers to any request for mandamus relief or claim based on the Second Amendment. FOAC responded with preliminary objections to two of PSP's preliminary objections, stating sovereign immunity and separation of powers are affirmative defenses that may only be raised via answer and new matter. *See* Pa.R.Civ.P. 1028, 1030(a).

A three-judge panel of the Commonwealth Court disposed of these pleadings in a unanimous memorandum opinion that incorporated the factual findings made by Judge McCullough. *See FOAC v. Evanchick*, No. 218 M.D. 2022, *slip op*. at 12 n.5 (Pa. Cmwlth. Mar. 6, 2023) ("*FOAC II*"). After overruling FOAC's preliminary objections,[16] the panel sustained PSP's demurrers and its preliminary objection relating to sovereign immunity. It dismissed as moot PSP's remaining preliminary objections and dismissed the Amended Petition. As for PSP's obligations under the Act, the panel recognized that upon receipt of a request for a background check, PSP must review the purchaser's history and provide the results to the seller "immediately" during the call "or by return call forthwith," and it must hire and train enough workers to administer the system "expeditiously." Because the statute does not define these terms, the panel consulted dictionary definitions and concluded the General Assembly intended for the results of background to be communicated "as efficiently and promptly as reasonably possible." *Id*. at 11.

Assuming the truth of FOAC's factual allegations regarding delays lasting several hours or even days, the panel concluded FOAC did not request a viable form of relief. It

---

[16] *See id*. at 6 (stating Rule 1030 does not bar raising separation of powers via preliminary objections, and immunity may be raised by preliminary objection where it is clear from the face of the pleading that no exception to sovereign immunity applies).

indicated mandamus was unavailable because the statute is not specific enough to spell out a mandatory or ministerial duty on PSP's part with "no room for argument" concerning the response time, PSP has a corresponding duty to protect the public by providing accurate background information to prevent guns from "falling into ineligible hands," and the "operational matters" complained of are discretionary, not mandated by statute. *Id*. at 12. The panel added that PSP's staffing and training decisions involve issues of budgeting and legislative appropriations beyond the reach of mandamus, and this precept encompasses the request for a waiver or refund of the $2.00 background-check fee where the buyer cancels the transaction, as the Uniform Firearms Act mandates payment of the fee but does not provide any refund mechanism. *See id*. at 13 & n.6. Additionally, the panel stated declaratory relief was precluded for the same reasons. *See id*. at 14 (citing *Stackhouse v. PSP*, 892 A.2d 54, 62 (Pa. Cmwlth. 2006) (indicating a declaration of rights should not issue in a case where its only purpose is to provide the legal predicate for an immunity-barred claim)). Finally, the panel reasoned FOAC failed to state a meritorious constitutional claim because the allegations do not suggest anyone has been denied that ability to purchase a firearm, only that the approval process sometimes takes longer than desired. *See id*. at 14-15.

Shortly after the panel issued its decision, FOAC requested leave to amend its petition to add allegations to the effect that the preliminary injunction resulted in a significant speed-up of background checks requiring operator intervention, thereby suggesting the delays previously experienced were not the result of insufficient staffing or funding, but of PSP's purposeful decision-making. *See* Pa.R.A.P. 123. For its part, PSP moved to dissolve the preliminary injunction. The court denied the request by single-judge memorandum and order, stating the request merely reflected FOAC's disagreement with the panel's legal conclusions. The court granted PSP's motion to

dissolve, however, noting in any event that the preliminary injunction had already been, in effect, superseded by a final judgment in favor of the opposing party.

FOAC lodged a timely appeal to this Court, asking whether the Commonwealth Court erred in sustaining PSP's preliminary objections, granting PSP's request to dissolve the preliminary injunction, and denying leave to further amend the Amended Petition. As we have received briefing and heard oral argument, the matter is ready for disposition.

### III. PSP's obligations under the statute

To address whether FOAC has raised a viable claim for relief, it is helpful first to inquire what the Uniform Firearms Act requires of PSP, a question on which the parties disagree. FOAC contends under the statute PICS operations must "be instantaneous and immediate," which in practice means PSP has a duty to provide an immediate answer stating whether a prospective gun buyer is approved or denied – and this duty involves mandatory, not discretionary, agency action. *See* Brief for Appellants at 33-34. FOAC asserts, in this respect, the General Assembly clearly intended to require instantaneous background checks and it clarified such intention by referring to the overall system as the Instantaneous Criminal History Records Check System. *See* Brief for Appellants at 30 n.86. Even to the extent "instantaneous" and "immediate" may be viewed as having different meanings, and the results need only be immediate or by return call forthwith rather than instantaneous, FOAC proffers these terms cannot reasonably describe the hours- or days-long wait times its members have experienced.

PSP proffers that although the computerized database search must be done instantaneously, its final answer to the inquiry – *i.e.*, the denial or the unique approval number – need not be supplied instantaneously, but rather, "immediately" during the FFL's call, or "by return call forthwith." According to PSP, the "immediate" and "forthwith" descriptors are not identical to "instantaneous," and they give PSP leeway to delay its

response for as long as necessary to make a final determination. Thus, PSP suggests the statute includes a reasonableness standard, arguing it is only required to communicate results to FFLs as promptly as is reasonably practicable. PSP continues that the automatic approvals, which account for 65% of the transactions and only take about five minutes to complete, are indeed provided immediately, and the final determinations for background checks requiring further investigation have all been given "forthwith" even where the investigation has taken hours or days. *See* Brief for Appellee at 31-37.

A review of the Uniform Firearms Act's text reveals the word "instantaneous" is most often used to refer to the PICS system as a whole. Section 6111 uses the term in four places, all of which refer to the overall system, not to a particular request for background information about an individual. *See* 18 Pa.C.S. §§ 6111(a)(2), (b)(1.1), (b)(1.4), (b)(6).[17] Section 6111.1, the only other provision in which the word appears, uses it six times, again mostly in reference to the system. For example, paragraph 6111.1(b)(3)(i) indicates that "[t]he instantaneous background check for firearms as defined in section 6102 (relating to definitions) shall begin on July 1, 1998." 18 Pa.C.S. § 6111.1(b)(3)(i). Even though this text does not include the word "system," it clearly refers to the overall system as it would make little sense to read it as referencing a specific background check on a particular individual.

There are two places where the overall system is not in view, and in both of those examples the word "instantaneous" modifies "record check." *See id*. §§ 6111.1(b)(2) (referring to instances when an FFL "complet[es] a transaction absent the completion of an instantaneous records check"), 6111.1(j.2) (providing that the requirements of Section 6111.1 "which relate to the instantaneous records check conducted by telephone" take

---

[17] The significance of this terminology for the system is discussed below.

effect 30 days after PSP publishes notice in the Pennsylvania Bulletin that PICS has been established). The concept of a "records check," absent further context, would not be entirely clear because it could mean a fully-automated database search, or alternatively, it could subsume the actions of human operators performing additional research. With the "instantaneous" modifier, however, we conclude it must refer only to the automatic search process that takes place with the speed of modern computers. The General Assembly does not intend results that are "impossible of execution," 1 Pa.C.S. § 1922(1), and that body is further presumed to have been aware, based on common sense and common experience, that if a human operator needs to resolve an indeterminate result by contacting another law enforcement agency – which might not be open for business just then because it is located in another jurisdiction in a different time zone, or because the request was submitted shortly before 10:00 at night – the process could require some time, and hence, not be "instantaneous."[18] Consequently, the term "instantaneous," when it is not used as a general descriptor for the system as a whole, is best understood as a way of referring solely to the computerized database search that looks for records matching the prospective transferee. There is no dispute herein that the computerized search process is effectively instantaneous because, as developed above, answers that do not require any human involvement are always given within a very short timeframe that FOAC does not challenge.

That brings us to the question of what the Uniform Firearms Act requires PSP to do for background checks that do require human involvement. The relevant provisions are paragraph 6111.1(b)(1) and subsection 6111.1(c). *See* 18 Pa.C.S. § 6111.1(b)(1), (c). The latter directs PSP to establish a phone number available seven days a week,

---

[18] In ordinary English usage, "instantaneous" means done in an instant or without delay. *See, e.g.*, Webster's New College Dictionary 588 (3d ed. 2008).

from 8:00 a.m. to 10:00 p.m., to receive FFL inquiries on prospective buyers, and to hire as many employees as are needed to administer the system "expeditiously."[19] The former requires PSP to perform background checks as it receives requests from FFLs via the phone line established under subsection (c). More specifically, PSP must complete the actions in subparagraphs (b)(1)(i)-(iii) "immediately during the [FFL's] call or by return call forthwith." Those subparagraphs entail (i) reviewing criminal history and fingerprint records, (ii) reviewing juvenile and mental health records, and (iii) telling the FFL the person is prohibited or providing the FFL a unique approval number.

The way the text of the statute is structured,[20] the disjunctive phrase *immediately during the licensee's call or by return call forthwith* applies directly to all subparagraphs, (i) through (iii). Thus, PSP is directed to perform the records review immediately during

---

[19] While the statute only requires a phone line, PSP has augmented that capability by use of a website, as already mentioned. Any reference to the phone line in the discussion below also encompasses the website unless otherwise stated.

[20] To review, paragraph (b)(1) states in full:

(1) Upon receipt of a request for a criminal history, juvenile delinquency history and mental health record check of the potential purchaser or transferee, the Pennsylvania State Police shall immediately during the licensee's call or by return call forthwith:

(i) review the Pennsylvania State Police criminal history and fingerprint records to determine if the potential purchaser or transferee is prohibited from receipt or possession of a firearm under Federal or State law;

(ii) review the juvenile delinquency and mental health records of the Pennsylvania State Police to determine whether the potential purchaser or transferee is prohibited from receipt or possession of a firearm under Federal or State law; and

(iii) inform the licensee making the inquiry either: (A) that the potential purchase or transfer is prohibited; or (B) provide the licensee with a unique approval number.

18 Pa.C.S. § 6111.1(b)(1).

the call or by return call forthwith – and then, once PSP reaches a determination, it is obligated to provide the answer to the FFL immediately during the call or by return call forthwith. The only part of this formulation affecting the FFL is PSP's action in providing it with an answer, and therefore, that will be the focus of our inquiry.[21]

In terms of providing an answer to the FFL immediately during the call, the meaning of such directive is straightforward. Immediately means without delay, *see* Black's Law Dictionary 749 (6th ed. 1990); Webster's New College Dictionary 566 (3d ed. 2008) ("**4.** Occurring at once."), and so that option requires PSP to give the FFL an answer essentially right away – a connotation reinforced by the fact that the answer is given during the FFL's initial call to PSP and not by return call. The other option available to PSP is to provide results by return call forthwith. The question becomes, then, what does it mean for PSP to give the FFL an answer by return call forthwith?

Unsurprisingly, this is an issue on which the parties disagree. PSP contends, quite sensibly, that by giving PSP the return-call-forthwith option the Legislature recognized not all background check requests could be resolved immediately over the phone. PSP continues by asserting that in *Commonwealth v. Smith*, 757 A.2d 354, 358 (Pa. 2000), we interpreted forthwith in the context of the Controlled Substances Forfeiture Act[22] to mean "within a reasonable time" rather than instantly, and it proffers we should interpret the word the same way under the Uniform Firearms Act. *See* Brief for Appellee at 24.

---

[21] By thus limiting our focus we need not address what the Legislature may have meant when it specified that PSP could perform a records review "by return call forthwith" – a somewhat awkward formulation in that any computerized review of records occurs *within* PICS. Unlike the final determination (the denial or the unique approval number), it is not something to be transmitted to the FFL, and PSP does not presently rest its argument on any asserted authority to conduct a records review via return call.

[22] Act of June 30, 1988, P.L. 464, No. 79 (as amended 42 Pa.C.S. §§ 6801-6802) (repealed and replaced by Act of June 29, 2017, P.L. 247, No. 13, § 9). Substantive provisions relating to controlled-substances forfeiture are now contained within the Forfeiture Act, which is codified at 42 Pa.C.S. Ch. 58, §§ 5801-5808.

Thus, according to PSP, there is no "hard time limit" to when an answer must be given; rather, it must be given "within a reasonable time under the circumstances." Under PSP's reading, an elapsed time of multiple hours or even days could be reasonable and meet this standard, an assertion PSP emphasizes by referring to the public interest in preventing firearms from being received by prohibited persons. *See id*. at 36-37.

FOAC argues in response that the phrase "or by return call forthwith" was included in the statute to prevent PSP from strategically not picking up the phone and then claiming that no request was ever made, thereby avoiding its responsibility to provide an immediate answer. Alternatively, FOAC suggests PSP's reliance on *Smith* overlooks that the other party must not be prejudiced by the delay. *See Smith*, 757 A.2d at 358 ("Thus, we conclude that . . . in order to satisfy the 'forthwith' requirement . . ., the proceedings must be initiated within a reasonable period of time and the defendant must not be prejudiced by the delay."). FOAC maintains any failure by PSP to provide an FFL with an immediate response prejudices the FFL's productivity and financial interests, and also prejudices a non-prohibited transferee's interest in quickly obtaining a firearm. *See* Reply Brief for Appellants at 8-12. In this latter regard, FOAC offers a hypothetical scenario in which a non-prohibited individual, after obtaining a protection-from-abuse order, tries to buy a firearm to protect herself from her assailant's potential actions notwithstanding that order, but is delayed from doing so with adverse results. *See* Brief for Appellant at 32.

Initially, we disagree that the return-call-forthwith provision was included in the statute solely to prevent PSP from shirking its responsibilities by not picking up the phone. FOAC does not reference any authority to support that interpretation, nor can it be discerned from the statute's text itself. *See generally In re Nov. 3, 2020 Gen. Election*, 240 A.3d 591, 611 (Pa. 2020) (observing that reviewing courts are not at liberty to add terms to a statute). Paragraph 6111.1(b)(1) gives PSP two options for responding to any

request it receives: immediately during the call, or by return call forthwith. It does not limit either option. *See supra* note 20. Further, because these two choices are listed in the alternative using disjunctive language, the legislative body did not view them as identical. *See* 1 Pa.C.S. § 1922(2) (providing the General Assembly intends every part of a statute to have some effect); *Commonwealth v. McClelland*, 233 A.3d 717, 734 (Pa. 2020) (explaining that statutory language should not be treated as surplusage). To the extent the timeframe for compliance differs as between them, the return-call alternative gives PSP some extra leeway, as it contemplates that some activity will take place between the initial call and the return call. The closely-contested issue, then, centers on what it means for PSP to provide an answer to the FFL by return call forthwith. In particular, does it give PSP a reasonable time to complete the task where "reasonable" can translate into several hours or even several days?

There is no reasonableness standard written into the description of PSP's duties under the Uniform Firearms Act. Although PSP correctly identifies that we interpreted forthwith under the Controlled Substances Forfeitures Act "to include a reasonable period of time," *Smith*, 757 A.2d at 358, the relevant portion of that enactment did not deal with legislation governing a system like PICS that was intended to produce immediate or nearly-immediate results – as are needed, for example, for firearms purchases at gun shows which by nature are short lived.[23] Further, the only decision by this Court that the *Smith* Court cited in support of its holding indicated that "forthwith" and "in a reasonable time" are distinct concepts. *See E. & W. Coast Serv. Corp. v. Papahagis*, 25 A.2d 341,

---

[23] The *Smith* dispute pertained to forfeitures effectuated without process, which the Controlled Substances Forfeiture Act permitted in certain discrete situations. *See* 42 Pa.C.S. § 6801(b) (repealed). If that occurred, proceedings for the issuance of process had to be instituted forthwith. *See id.* § 6801(c) (repealed). The two Commonwealth Court cases cited in *Smith* related to PennDOT's duty to revoke a driver's operating privileges forthwith upon receiving notice of that person's conviction of certain offenses.

342 (Pa. 1942) (explaining a specified action must be done "*either* forthwith *or* within a reasonable time") (emphasis added). To transport the holding of *Smith* to the present context would therefore be overly simplistic. And this is where the General Assembly's repeated use of the word "instantaneous" to describe the system becomes relevant. *See supra* note 17. It informs our understanding of what it means to provide the FFL with the denial or unique approval number immediately or forthwith, and it counsels against any suggestion PSP fulfills its statutory obligations as long as it acts in a manner some disinterested observer may describe as "reasonable" without any further elaboration.

At the same time, PSP cannot have been intended to do the impossible, *see* 1 Pa.C.S. § 1922(1) (reflecting a presumption that the General Assembly does not intend a result that is "impossible of execution"), nor can the legislative body have intended that all of the Commonwealth's resources – or even all of PSP's resources – be diverted from other essential tasks and functions to fulfill this one legislative mandate.[24] Thus, rather than a vague reasonableness metric, we believe the legislative body intended for PSP to provide results *as quickly as possible* with the resources it has available. This means in operating PICS, PSP is not permitted to divert resources elsewhere absent a statutory mandate to do so, and it must make a good faith effort to keep the system staffed to the degree necessary to reduce its response time on callbacks to a minimum. This, we believe, is what the Legislature meant when it directed PSP to "employ and train such personnel as are necessary to administer *expeditiously* the provisions of this section." 18 Pa.C.S. § 6111.1(c) (emphasis added).

---

[24] PSP argues if we hold background checks requiring research by PICS operators must nonetheless be completed instantaneously, its only option would be to deny all such requests. *See* Brief for Appellee at 38-39 (adding it is "difficult to see how that would benefit firearms sellers or buyers"). As PSP appears to recognize, that option is not open to it. Returning a denial for a prospective transferee who is, in fact, permitted to receive a firearm would violate that individual's rights, something PSP is not authorized to do, just as PICS is not authorized to approve the sale of a firearm to a prohibited person.

## IV. Relief – Operation of PICS

Having examined the statute and determined what it requires of PSP, we turn to whether any relief is available to FOAC on the basis of its pleadings and the record developed before the Commonwealth Court. As previously described, between its Amended Petition and its Application for Summary and Special Relief, FOAC requested: (a) a permanent injunction directing PSP to comply with the Uniform Firearms Act either by repurposing existing employees or by hiring new employees to ensure all background checks are performed according to statutory requirements, (b) a writ of mandamus, and (c) declaratory relief. FOAC additionally sought an injunction prohibiting PSP from charging the $2.00 fee for any background check where the customer cancels the purchase due to a delayed response. That topic is addressed in Part V below. Presently we speak to the three requests relating to PSP's response to requests lodged by FFLs for a background check on a prospective gun transferee.

### A. Permanent injunctive relief

Under Pennsylvania law the Commonwealth and its officials generally enjoy sovereign and official immunity from suit except where such immunity is waived by the General Assembly. *See* 1 Pa.C.S. § 2310; 42 Pa.C.S. § 8521.[25] Absent such waiver, *e.g.*, 42 Pa.C.S. § 8522 (waiving immunity relative to certain damage claims), this immunity, which has been described as "fundamental," *Brooks v. Ewing Cole, Inc.*, 259 A.3d 359, 371 & n.4 (Pa. 2021), acts as a shield against liability where a party seeks to compel affirmative action by the Commonwealth or a Commonwealth agency. *See Phila. Life Ins. Co. v. Commonwealth*, 190 A.2d at 112, 114 (Pa. 1963) ("Suits which seek to

---

[25] Sovereign immunity has its roots in English Common law, but in Pennsylvania it is now governed exclusively by statute. *See Dorsey v. Redman*, 96 A.3d 332, 340 (Pa. 2014); PA. CONST. art. I, § 11 ("Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.").

compel affirmative action on the part of state officials or to obtain money damages or to recover property from the Commonwealth are within the rule of immunity."). Sovereign immunity does not apply where the party seeks to have a law declared unconstitutional, *see Wilkinsburg Police Officers Ass'n v. Commonwealth*, 636 A.2d 134, 137 (Pa. 1993), or to restrain an agency from performing an affirmative act. *See Legal Capital, LLC v. CAT Fund*, 750 A.2d 299, 302 (Pa. 2000).[26]

In the present dispute, FOAC asked the Commonwealth Court to order PSP to hire as many new employees for the PICS Operations Section, or to "repurpose" as many existing ones to perform that work, as necessary to ensure all background checks are performed, and responses provided, in compliance with the Uniform Firearms Act. FOAC acknowledges its request invokes injunctive relief mandating performance of an affirmative duty by a Commonwealth official, *see* Brief for Appellant at 24-25, but it argues immunity does not preclude such relief where the duty is "mandatory." *Id*. at 26. FOAC relies for this position on *Allegheny County v. Commonwealth*, 490 A.2d 402 (Pa. 1985).

In *Allegheny County* this Court dealt primarily with whether mandamus relief was available to compel a state agency to take a particular action to alleviate an overcrowding crisis at a county jail. We granted a preliminary injunction based on the county's showing

---

[26] Although we have indicated the distinction between suits to compel affirmative action and suits to restrain action "is clear," *Wilkinsburg Police Officers Ass'n v. Commonwealth*, 636 A.2d 134, 137 (Pa. 1993) (quoting *Fawber v. Cohen*, 532 A.2d 429, 433-34 (Pa. 1987)), we have also acknowledged, somewhat inconsistently, that any such distinction "can be difficult, because the difference is ambiguous and malleable across a wide range of applications." *Scientific Games Int'l v. Commonwealth*, 66 A.3d 740, 757 (Pa. 2013). This is because whether a court is ordering a party to act or to refrain from acting can be a matter of semantics more than substance. *Accord id*. at 757 n.26 (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)); *cf. Stackhouse v. PSP*, 892 A.2d 54, 61 (Pa. Cmwlth. 2006) ("[I]t is the substance of the relief requested and not the form or phrasing of the requests which guides our inquiry.") (citing *Legal Capital*, 750 A.2d at 302-03). Regardless, FOAC does not rest its position on any assertion it is only seeking to restrain official action; rather, it proffers essentially that sovereign immunity simply does not apply to lawsuits seeking to compel affirmative action, as discussed *infra*.

that it had a clear right to mandamus relief. *See id*. at 413-14. *See generally Marcellus Shale Coal. v. DEP*, 185 A.3d 985, 986 n.4 (Pa. 2018) (listing as one of the criteria for a preliminary injunction that the party seeking it has a clear right to relief and is likely to prevail on the merits). The underlying relief sought, therefore, was a writ of mandamus, not a permanent injunction. Unlike permanent injunctions compelling an affirmative act, writs of mandamus are not barred by sovereign immunity, *see infra* Part IV(B), and nothing in *Allegheny County* suggests we purported to recognize an exception to sovereign immunity as to such injunctions. Therefore, FOAC's reliance on *Allegheny County* is unavailing, and the Commonwealth Court was correct in concluding the permanent injunctive relief FOAC requests is barred by sovereign immunity.

### B. Mandamus relief

Although sovereign immunity bars a permanent injunction directing affirmative action on the part of a Commonwealth agency or official, the same is not true of a writ of mandamus, *see Bronson v. Commonwealth Bd. of Probation & Parole*, 421 A.2d 1021, 1023 (Pa. 1980), the very purpose of which is to direct a government official to perform a ministerial act or mandatory duty. *See Tritt v. Cortes*, 851 A.2d 903, 906 (Pa. 2004). When the General Assembly enacted 1 Pa.C.S. § 2310, the statute's purpose and effect was to restore sovereign immunity as it existed before this Court abolished it two months earlier in *Mayle v. Pennsylvania Department of Highways*, 388 A.2d 709 (Pa. 1978). *See MFW Wine Co. v. Pa. Liquor Control Bd.*, 318 A.3d 100, 131 (Pa. 2024). Therefore, the same contours that defined sovereign immunity prior to *Mayle* continue to define it in the wake of Section 2310's enactment. *See id*. at 132. There is no suggestion that sovereign immunity barred actions in mandamus prior to *Mayle*. *See, e.g., Meadville Area Sch. Dist. v. Dep't of Pub. Instruction*, 159 A.2d 482 (Pa. 1960) (issuing a writ of mandamus to compel action by Commonwealth officials).

A proceeding in mandamus "is an extraordinary action at common law, designed to compel performance of a ministerial act or mandatory duty where there exists a clear legal right in the plaintiff, a corresponding duty in the defendant, and want of any other adequate and appropriate remedy." *Coady v. Vaughn*, 770 A.2d 287, 289 (Pa. 2001). A ministerial act is one that does not involve the exercise of discretion or judgment. *See Lhormer v. Bowen*, 188 A.2d 747, 750 (Pa. 1963); *Tanenbaum v. D'Ascenzo*, 51 A.2d 757, 758 (Pa. 1947). For example, where legislation requires an official to grant a license to a person upon payment of a certain fee, mandamus will lie to compel that action. *See Volunteer Firemen's Relief Ass'n of Reading v. Minehart*, 203 A.2d 476, 479 (Pa. 1964). However, mandamus relief is not available to "compel performance of a discretionary act or to govern the manner of performing a required act." *Id*.; *accord Phila. Firefighters' Union, Local 22, Int'l Ass'n of Firefighters, AFL-CIO ex rel. Gault v. City of Phila.*, 119 A.3d 296, 304 (Pa. 2015).

If FOAC had alleged, for example, that PSP engages in a practice of unjustifiably withholding the results of a background check from the requesting FFL for a period of time, it is conceivable a court could then, under a mandamus rubric, direct PSP to cease such practice and provide the answer to the FFL without any artificial delay. Here, there is no contention along these lines and so FOAC's position is best understood as requesting an order directing PSP to alter the way it manages the PICS Operations Section, including the hiring, training, and assignment of new personnel, so that responses to FFL requests for a background check always occur within a very short period of time. In this regard, FOAC centers its argument on language in the Uniform Firearms Act requiring PSP to perform "instantaneous" checks, provide an "immediate" response, and employ and train such personnel as needed to administer PICS "expeditiously." *See* Brief for Appellants at 26. FOAC adds that response times of many

hours or multiple days for non-prohibited individuals can hardly be described as immediate, without delay, or marked by prompt efficiency. *See id*. at 31-32.[27]

As developed in Part III above, we are not aligned with some facets of FOAC's reading of the statute. For example, responses need not always be "immediate" because PSP may instead provide a result by "return call forthwith." And to the extent FOAC suggests an "instantaneous record check" equates to an instantaneous response, we have observed the "instantaneous" descriptor applies to the computerized record search and not to the research conducted, where needed, by human operators. *See supra* note 18 and accompanying text.

With that said, FOAC's contentions also highlight that the statute unambiguously requires PSP to "employ and train" enough workers to ensure it runs the PICS system "expeditiously." 18 Pa.C.S. § 6111.1(c), *quoted in* Brief for Appellants at 28, Reply Brief for Appellants at 17. But such staffing decisions necessarily entail the exercise of managerial discretion and judgment. Managers at PSP must decide on the appropriate ratio of supervisors to operators for each team and the number of teams that should work each shift; they need to determine how to handle an expected high volume of requests when a gun show is scheduled; and they have to choose the frequency and methodology of performance reviews, both for individual employees and for the system as a whole, to ascertain whether a change should be implemented to the staffing levels for each shift. Nothing in the Uniform Firearms Act imposes upon PSP any purely ministerial duties with regard to these types of managerial decisions. The policy judgment of the General Assembly in complying with the Brady Act is expressed in terms that leave these choices up to PSP. That being the case, mandamus will not lie to compel PSP to adopt a particular

---

[27] FOAC's complaint is narrowly focused upon background checks requiring human intervention because, as explained, the approximately-five-minute response times for fully-automatic record checks are not presently being challenged.

course of conduct in relation to such matters. *Accord FOAC II*, *slip op.* at 13 (indicating the Commonwealth Court could not issue a writ of mandamus dictating how PSP must staff, organize, or fund the PICS Operations Section when the Uniform Firearms Act leaves such matters to PSP's discretion). Although FOAC repeatedly emphasizes that mandamus may lie "even if the existence and/or scope of the duty must be found and defined in the mandamus action itself," *Minehart*, 203 A.2d at 479, *quoted in* Brief for Appellant at 26, 27, 32, 35, that precept is not applicable here because the existence and scope of PSP's duties are derived from the statute, not from the evidence that has been adduced, or could be adduced, in the trial court.

### C. Declaratory relief

In addition to injunctive and mandamus relief, FOAC sought an award in the Commonwealth Court under the Declaratory Judgments Act.[28] That statute was enacted in response to a tendency among the courts of this Commonwealth to limit the availability of relief to cases in which "an actual wrong has been done or is imminent." *Bayada Nurses, Inc. v. Commonwealth, Dep't of Labor & Indus.*, 8 A.3d 866, 874 (Pa. 2010). It constitutes remedial legislation to be construed liberally in order to provide relief from uncertainty concerning "rights, status, and other legal relations." *City of Phila. v. Commonwealth*, 838 A.2d 566, 583 (Pa. 2003); *see* 42 Pa.C.S. § 7541(a) ("This subchapter is declared to be remedial. Its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered.").

---

[28] Act of July 9, 1976, P.L. 586, No. 142, § 2 (as amended 42 Pa.C.S. §§ 7531-7541). The current Declaratory Judgments Act replaced and recodified Pennsylvania's prior enactment on the topic, which was derived from the Uniform Declaratory Judgments Act. *See* Act of June 18, 1923, P.L. 840 (as amended, 12 P.S. §§ 831–846) (repealed); *City of Phila. v. Commonwealth*, 838 A.2d 566, 583 n.13 (2003).

The distinctive feature of a declaratory judgment is that it "stands by itself," meaning "no executory process follows as of course." *Petition of Kariher*, 131 A. 265, 268 (Pa. 1925). *See generally id*. at 267-68 (tracing the procedure for obtaining a declaratory judgment from classical Roman law). In creating the act, the Legislature expressly abolished the principle making declaratory relief available only where some other action at law or in equity could be brought. *See* 42 Pa.C.S. § 7541(b). Thus, a declaratory judgment is stated to be "additional and cumulative to all other available remedies," *id*.; *see Robinson Twp., Wash. Cnty. v. Commonwealth*, 83 A.3d 901, 990 (Pa. 2013), and Courts may declare the parties' rights, status, and other legal relations "whether or not further relief is or could be claimed." 42 Pa.C.S. § 7542. This includes their rights under a statute such as the Uniform Firearms Act. *See id*. § 7533 ("Any person . . . whose rights, status, or other legal relations are affected by a statute, . . . may have determined any question of construction or validity arising under the . . . statute, . . . and obtain a declaration of rights, status, or other legal relations thereunder.").

As for sovereign immunity, PSP agrees there is no *per-se* bar to declaratory judgments against the Commonwealth. *See* Brief for Appellee at 44. Notably, the Commonwealth did not previously enjoy immunity from declaratory judgments, *see Fawber v. Cohen*, 532 A.2d 429, 434 (Pa. 1987), and where declaratory relief would not directly compel an affirmative act by the Commonwealth or a Commonwealth official, sovereign immunity does not preclude a declaration of rights. *See id*.; *Legal Capital*, 750 A.2d at 302 (citing, *inter alia*, *Wilkinsburg Police Officers Ass'n v. Commonwealth*, 636 A.2d 134, 137 (Pa. 1993) (sovereign immunity poses no bar to counts of a complaint where the counts only seek a declaration that certain provisions of an act are unconstitutional)). Nor are declaratory judgments disfavored as mere advisory opinions, *see, e.g.*, *Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467, 482 (Pa. 2021);

*Lakeland Joint Sch. Dist. Auth. v. Sch. Dist. of Scott Twp.*, 200 A.2d 748, 751 (Pa. 1964), at least where the usual justiciability prerequisites such as standing are satisfied. *See Commonwealth, Office of Governor v. Donahue*, 98 A.3d 1223, 1229 (Pa. 2014); *Gulnac by Gulnac v. S. Butler Cnty. Sch. Dist.*, 587 A.2d 699, 701-02 (Pa. 1991).

Here, FOAC alleged that at some point PSP began implementing a new practice of understaffing the PICS Operations Section, thereby substantially slowing down the responses to FFL requests for background checks. It accordingly sought a judicial declaration that such practice failed to comply with PSP's obligation under the Uniform Firearms Act to maintain enough personnel to run PICS "expeditiously," 18 Pa.C.S. § 6111.1(c), and that PSP was statutorily required to remedy that situation by hiring and training enough new workers to bring it into compliance. *See* Amended Petition ¶ 53, Request for Relief ¶ a, *reprinted in* RR. 34a, 36a; Application for Summary and Special Relief, Request for Relief ¶¶ (1), (2), *reprinted in* RR. 484a. Assuming the truth of FOAC's well-pleaded allegations, as the Commonwealth Court was required to do when addressing PSP's demurrer, *see J.B. v. PSP*, 273 A.3d 77, 82 (Pa. Cmwlth. 2022), FOAC's request fell within the scope of the relief available under the Declaratory Judgments Act.[29]

The Commonwealth Court initially acknowledged FOAC's claim was viable to the extent it was seeking a declaration of duties and benefits under the Uniform Firearms Act.

---

[29] In the dissenting portion of her responsive opinion, the Chief Justice offers a policy rationale for deeming declaratory relief unavailable in this matter, and she argues there are material distinctions between this case and the decisions cited above. Our holding is based on the terms of the Declaratory Judgements Act, which expressly allow for such relief "whether or not further relief is or could be claimed," 42 Pa.C.S. § 7532, subject only to three enumerated exceptions, *see id*. § 7541(c), none of which apply. We presume when it enacted the statute the General Assembly balanced the policy concerns expressed by the Chief Justice against competing policy objectives, and we are obligated to effectuate the result of that weighing process absent a constitutional limitation. *See Program Admin. Servs. v. Dauphin Cnty. Gen. Auth.*, 928 A.2d 1013, 1017-18 (Pa. 2007).

*See FOAC II, slip op.* at 8. But it denied relief on the grounds it could not judicially establish a fixed amount of time by which responses must be given, particularly as doing so could force PSP to approve gun buyers who, upon further examination, might be found to be prohibited persons – and, moreover, the Uniform Firearms Act does not itself establish a particular maximum number of minutes or hours for completion of a background check. *See id*. at 14. The court expressed, as well, that the only purpose a declaratory judgment could serve under the circumstances was to be a "legal predicate" to damages or some other immunity-barred claim. Thus, according to the Commonwealth Court,

> the demand for declaratory relief ought to fall along with the claim it serves to support. The purpose of absolute sovereign immunity – to insulate state agencies and employees not only from judgments but also from being required to expend the time and funds necessary to defend suits – would be frustrated if the declaratory action were allowed to go forward under those circumstances.

Id. (quoting *Stackhouse v. PSP*, 892 A.2d 54, 62 (Pa. Cmwlth. 2006)).

We agree with the court's analysis to the extent it pointed out the Uniform Firearms Act does not establish a fixed timeframe for responses. As developed above, however, the scope of the declaration FOAC sought was broader than that, and the court did not identify any aspect of the Declaratory Judgments Act that would preclude it from providing declaratory relief addressing PSP's obligation to come into compliance with Section 6111.1(c) should FOAC's allegations ultimately be borne out by the evidence.[30] Finally,

---

[30] We recognize that there was an evidentiary hearing, but it pertained solely to the question of whether a preliminary injunction should issue. The panel decision in March 2023 clarified that it was addressing PSP's demurrer. Although the panel did expressly incorporate the factual findings made in the single-judge ruling from September 2022, the panel described those findings, for purposes of its ruling, as *confirming* the allegations contained in FOAC's pleadings. *See FOAC II, slip op*. at 12 n.5. Thus, the presumptions ordinarily attendant to a ruling on a demurrer were not altered by the evidence previously presented by the parties.

the court's suggestion that a request for a judicial declaration must fall with the claim it serves to support is directly contradicted by the established precept that declaratory judgments have independent value and can be provided apart from other types of relief. *See RT Partners, LP v. Allegheny Cnty. Ofc. of Prop. Assessment*, 307 A.3d 801, 805 (Pa. Cmwlth. 2023) (indicating "the distinctive characteristic of the declaratory judgment is that the declaration stands by itself; that is to say, no executory process follows as of course") (indirectly quoting *Petition of Kariher*, 131 A. at 268). We have recognized that such declarations can affect the functioning of state officials administering statutory law even apart from judicially compelling affirmative action, *see Fawber*, 532 A.2d at 434, and in all events litigants are entitled to a declaration of rights even absent "consequential relief." *Id.*[31] Therefore, the Commonwealth Court panel erred in denying declaratory relief, and we will remand for appropriate action by that tribunal.

### V. Relief – the $2.00 Fee

In addition to its challenge regarding the PICS response times, FOAC argues that FFLs are entitled to a refund of the $2.00 fee PSP charges for any background check where the buyer cancels the transaction due to PSP's delay. The relevant portion of the Uniform Firearms Act provides:

> **(b) Duty of seller.**--No licensed importer, licensed manufacturer or licensed dealer shall sell or deliver any firearm to another person, other than a licensed importer, licensed manufacturer, licensed dealer or licensed collector, until the conditions of subsection (a) [relating to time and manner of delivery] have been satisfied  and until he has:  . . .  (3) Requested by

---

[31] The Chief Justice questions what practical good declaratory relief could do in this matter standing alone, *see* Concurring and Dissenting Op. at 4 (Todd, C.J.), and she predicts Appellants may be "underwhelmed" by it. *Id*. at 6. It suffices that Appellants have requested such relief and are legally entitled to it. Additionally, where, as here, a judicial declaration of rights addresses the duties of state officials, we should not limit the availability of such relief based on a presumption that those officials will simply ignore the judicial pronouncement. *See Fawber*, 532 A.2d at 434.

means of a telephone call that the Pennsylvania State Police conduct a criminal history, juvenile delinquency history and a mental health record check. The purchaser and the licensed dealer shall provide such information as is necessary to accurately identify the purchaser. The requester shall be charged a fee equivalent to the cost of providing the service but not to exceed $2 per buyer or transferee.

18 Pa.C.S. § 6111(b)(3).

The above reflects that the fee is charged to the "requester," meaning the FFL referred to in the introductory text of subsection (b), for the initiation of the request. The fee is plainly aimed at defraying PSP's costs in running PICS, and even in instances where the sale is prematurely cancelled PSP must incur at least some costs associated with operating the system. The statute does not contain any language suggesting the fee is refundable if the transaction is cancelled prematurely. That being the case, regardless of the form of relief FOAC is requesting with respect to the fees that have been paid or will be paid in the future, there is no basis for a court to award a refund or enjoin PSP from charging such fees. We will therefore affirm the Commonwealth Court's ruling to the extent it denied relief in relation to the $2.00 fee that PSP charges FFLs for each background check.

## VI. Dissolution of the preliminary injunction

FOAC next claims the Commonwealth Court panel should not have dissolved the preliminary injunction previously issued via single-judge order in *FOAC I*. As discussed, the panel dissolved the preliminary injunction on the grounds it was superseded by a final ruling in favor of the opposing party (PSP).

A preliminary injunction "is by its very nature interlocutory, tentative and impermanent." *Ameron, Inc. v. U.S. Army Corps of Engineers*, 610 F. Supp. 750, 757 (D.N.J. 1985). It serves to preserve or restore the status quo during the course of the litigation, and thus, to "temporarily prevent irreparable injury or gross injustice." *Slott v. Plastic Fabricators, Inc.*, 167 A.2d 306, 307 (Pa. 1961); *see also Hamilton Watch Co. v.*

*Benrus Watch Co.*, 206 F.2d 738, 742 (2d Cir. 1953) (stating a preliminary injunction "serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began"). A final ruling on the merits by the court that issued the preliminary injunction necessarily supersedes the earlier preliminary injunction. *Accord, e.g.*, *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1217 n.1 (Pa. Super. 1989) (*en banc*). We find no error in the panel's decision in this regard.[32]

## VII. Leave to amend

FOAC's final argument is that the Commonwealth Court erred in denying leave to further amend the Amended Petition to include allegations reflecting that, after the preliminary injunction was issued, background checks requiring operator intervention began taking less time than before – thus implying the prior delays stemmed from PSP's practice of understaffing the PICS Operations Section. In denying leave to amend, the court indicated it had already considered the essential points FOAC now sought to interpose, as the factual findings incorporated from *FOAC I* confirmed what FOAC had fundamentally alleged in the Amended Petition. The court additionally cited *Lacava v. SEPTA*, 157 A.3d 1003 (Pa. Cmwlth. 2017), for the position that leave to amend a complaint may be withheld "where the initial complaint reveals that the *prima facie* elements of a claim cannot be established and where the defects are so substantial that amendment is not likely to cure the defects." *Id*. at 1017.

---

[32] We note FOAC's advocacy on this issue is underdeveloped. It consists of a brief paragraph that does not refer to or discuss any legal authority. Instead, it merely asserts in a conclusory manner that the panel erred because "injunctive, declaratory and mandamus relief are available" to FOAC. Brief for Appellants at 36.

FOAC primarily takes issue with the court's suggestion it had already considered the new facts. FOAC asserts the panel decision was devoid of any mention or consideration of the effects of the preliminary injunction or the "different relief requests" included in the application to amend.[33]

A review of FOAC's pleading seeking leave to amend reflects it is aimed at supporting FOAC's earlier request for injunctive, mandamus, and declaratory relief. Its allegations that the PICS Operations Section sped up its background checks in response to the preliminary injunction feed into a claim PSP is therefore capable of complying with the Uniform Firearms Act and, as such, should be "compel[led]" to do so "as there is no other appropriate or adequate remedy." Application for Leave to File Amended Petition for Review, at ¶ 4(b)(iv), *reprinted in* RR. 495a. Those averments also support a reiteration of the claim that FOAC is entitled to declaratory relief enumerating PSP's duties and the rights of FOAC members. *See id*. at ¶ 4(e), *reprinted in* RR. 495a-496a.

We do not agree with the suggestion, contained in the Commonwealth Court's single-judge memorandum, that FOAC's request was limited to its disagreement with the panel's legal conclusions. To the contrary, FOAC sought to allege facts concerning PSP's reaction to the preliminary injunction that were not before the court when it ruled on the request for a preliminary injunction. Additionally, while we have concluded that FOAC cannot obtain a permanent injunction or a writ of mandamus, we have also determined that it may proceed with its request for a declaration of rights and duties – which in turn negates the premise for the Commonwealth Court's decision not to allow amendment,

---

[33] FOAC also states it has obtained additional information and evidence relating to PSP's delays. FOAC does not specify what these items are – which in any event we may not consider as they are not part of the certified record on appeal. *See Reginelli v. Boggs*, 181 A.3d 293, 308 (Pa. 2018).

*i.e.*, that FOAC cannot establish the *prima facie* elements of any of its causes of action. We will therefore vacate the court's order denying such leave.

### VIII. Conclusion

For the reasons given above, the orders of the Commonwealth Court are affirmed insofar as they denied injunctive and mandamus relief and dissolved the preliminary injunction. The order of the Commonwealth Court panel is reversed to the degree it denied declaratory relief, and the order denying leave to amend is vacated. The matter is remanded for further proceedings consistent with this opinion.

Justices Donohue, Dougherty, Wecht, Brobson and McCaffery join the opinion.

Chief Justice Todd files a concurring and dissenting opinion.